**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

CHERI BOND,

       Plaintiff,                                CASE NO. 06-15072
                                                      HON. LAWRENCE P. ZATKOFF

v.

ECOLAB, INC., a Minnesota Corporation,
and METROPOLITAN LIFE INSURANCE
COMPANY, a New York Company,
jointly and severally,

       Defendants.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on February 21, 2007

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court upon Plaintiff's Motion for Summary Judgment (Docket #6) and Defendants' Motion to Affirm the Administrator's Decision or, alternatively, for Summary Judgment (Docket #9). The Court finds that the facts and legal arguments are adequately presented in the parties' papers and the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. MICH. LR 7.1(e)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted. For the following reasons, Defendants' motion will be GRANTED and Plaintiff's motion will be DENIED.

## II.  BACKGROUND

### A. Factual Background

On the evening of August 27, 2005, Steven Bond was found dead in his home in Atlas Township, Michigan. *See* Administrative Record ("AR") at 119. Mr. Bond was found in his basement office hanging from a black and orange nylon rope which had been connected to a hook attached to a floor joist in the ceiling of the basement. *See id.* The rope was tightened around Mr. Bond's neck and was looped once with a slip-knot. *See id.* at 126. The same rope was bonded to Mr. Bond's wrists, situated behind his body, and was looped eight times. *See id.* The rope then continued to Mr. Bond's ankles, where it was looped eighteen times. *See id.* A separate white rope was looped around Mr. Bond's ankles five times. *See id.* Mr. Bond was in a position on his knees with a metal folding chair in front of him and was wearing a dark blue turtleneck shirt and a pair of gray sweat-shorts. *See id.* at 119. The police and medical examiners concluded that Mr. Bond's death was accidental and occurred during the practice of self-inflicted autoerotic asphyxiation. *See id.* at 130, 180.

Autoerotic asphyxia is the practice of limiting the flow of oxygen to the brain in order to heighten sexual pleasure, usually, as in this case, by exerting pressure on the arteries of the neck to constrict blood flow to the brain. *See id.* at 204. The reduction of blood flow to the brain results in the depletion of oxygen, known as hypoxia, and a concomitant increase of carbon dioxide in the blood, known as hypercapnia, causing a euphoric effect. *See id.* at 140, 204. The hypoxic state stimulates nerve centers in the brain, thereby increasing the perceived intensity of a sexual experience. *See id.* at 204. The general consensus among experts on the subject is that practitioners of autoerotic asphyxiation do not intend to die, but rather to survive the experience and repeat the

behavior. *See id.* at 184-203, 205.

At the time of his death, Mr. Bond was employed by Defendant Ecolab, Inc., and participated in the Ecolab Life, Accidental Death or Dismemberment Plan ("the Plan"). Accordingly, Mr. Bond was insured against accidental death. Accidental death or dismemberment ("ADD") benefits are funded by a group policy of insurance issued by Defendant Metropolitan Life Insurance Company ("MetLife"), which is the claims fiduciary for the Plan. *See id.* at 78. Mr. Bond's ADD policy stated:

> We will pay Accidental Death or Dismemberment Benefits for a Covered Loss shown in Section C if you are injured in an accident which occurs while you are covered for Accidental Death or Dismemberment Benefits; and if
>
> 1. the accident is the sole cause of the injury; and
>
> 2. that injury is the sole cause of that Covered Loss; and
>
> 3. that Covered Loss occurs not more than one year after the date of the accident.

*Id.* at 60. However, the policy does not cover a loss "if it in any way results from, or is caused or contributed by ... injuring oneself on purpose ...." *Id.* at 63. Under the terms of the Plan, MetLife had the responsibility to make the initial determination of whether a claim is covered. *See id.* at 81. The Plan also provided a procedure for appealing an adverse initial determination. *See id.* at 83. Finally, the Plan delegated discretionary authority to its fiduciaries, stating:

> In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that such interpretation or determination was arbitrary and capricious.

*Id.* at 83.

**B. Procedural Background**

Following his death, Mr. Bond's wife, Plaintiff in the present case, submitted claims to MetLife under Mr. Bond's life insurance and ADD policies. MetLife paid Plaintiff $220,000 pursuant to Mr. Bond's standard life insurance policy; however, on March 24, 2006, MetLife issued a letter denying Plaintiff benefits under the ADD policy. That letter outlined the relevant terms of the ADD policy and explained that based on the autopsy report, which stated that Mr. Bond "died of self-inflicted autoerotic asphyxia," MetLife concluded that the death was not an accident within the terms of the Plan. *See id.* at 133. The letter also indicated that MetLife relied on the policy's exclusion for self-inflicted injuries.[1] *See id.*

On May 15, 2006, Plaintiff appealed from the denial of ADD benefits. In support of her appeal, Plaintiff submitted Mr. Bond's death certificate and autopsy report, affidavits from the police officers who investigated his death, her own affidavit, affidavits from the Oakland County Medical Examiner and a psychiatrist knowledgeable about autoerotic asphyxiation, and an article regarding autoerotic fatalities. Nevertheless, Plaintiff filed her complaint in this case before MetLife made a final decision on her appeal; however, MetLife's denial of benefits and its reasoning remain in force. This matter is now before the Court upon Plaintiff's Motion for Summary Judgment and Defendants' Motion to Affirm the Administrator's decision.

### III.  LEGAL STANDARD

Plaintiff challenges the denial of ADD benefits due to her under section 502(a)(1)(B) of ERISA, which authorizes an individual to bring an action "to recover benefits due to [her] under the

---

[1]The Court finds that there is no substantive difference between "injuring oneself on purpose" and "self-inflicted injures." Therefore, the Court will use these phrases interchangeably.

terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the plan." 29 U.S.C. § 1132(a)(1)(B). "As a general principle of ERISA law, federal courts review a plan administrator's denial of benefits de novo, 'unless the benefit plan gives the plan administrator discretionary authority to determine eligibility or to construe the terms of the plan.'" *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir. 2001)(quoting *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998)). *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "[I]f a plan expressly grants to the administrator such discretion, and there is no conflict of interest ... the district court ... must review the administrator's denial of benefits under the highly deferential arbitrary-and-capricious standard of review." *Jones v. Metropolitan Life Ins. Co.*, 385 F.3d 654, 660 (6th Cir. 2004). In cases where a conflict of interest does exist, the standard of review does not change, but "that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, Comment *d* (1959)).

In this case, the Plan clearly granted MetLife discretionary authority to determine eligibility and to construe the terms of the Plan. *See* AR at 83. Therefore, the Court will review MetLife's decision under the arbitrary-and-capricious standard. *See Jones*, 385 F.3d at 660. In doing so, the Court takes note of the fact that MetLife is also the Plan's insurer, creating a conflict of interest to be weighed as a factor in determining whether there has been an abuse of discretion. *See Firestone*, 489 U.S. at 115. The issue in the present case is whether MetLife acted arbitrarily and capriciously in denying Plaintiff benefits under her late husband's ADD policy. In deciding this issue, the Court is limited to reviewing the administrative record as presented to the Plan administrator, in this case MetLife. *See Wilkins*, 150 F.3d at 618; *Perry v. Simplicity Engineering*, 900 F.2d 963 (6th Cir.

1990). Under the arbitrary-and-capricious standard, MetLife's decision will be upheld if it is "rational in light of the plan's provisions." *Univ. Hospitals of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Bank & Capital Trust Co. of Frankfort Kentucky v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir 1985)) (internal quotation marks omitted).

### IV. ANALYSIS

Defendants argue that the facts as presented in the administrative record demonstrate that Mr. Bond's death was not accidental and is, therefore, not covered under the terms of the ADD policy. Defendants also argue that even if the death was accidental, Plaintiff is excluded from receiving benefits because the death resulted from a self-inflicted injury. Thus, Defendants conclude MetLife's decision should be affirmed. In contrast, Plaintiff argues that MetLife's decision was arbitrary and capricious because the facts contained in the administrative record conclusively show that Mr. Bond's death was an accident and that he did not intend to injure himself.[2] Plaintiff relies heavily on the fact that Mr. Bond's death certificate identifies the manner of death as "Accident," and the autopsy report concludes that the death was accidental..

After a thorough review of the administrative record and the parties' arguments, the Court finds that the issue of whether Mr. Bond's death was accidental for the purposes of the ADD policy

---

[2]Plaintiff's motion is labeled as a motion for summary judgment. Pursuant to the holding in *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998), the summary judgment procedure under FED. R. CIV. P. 56 no longer applies to the Court's review of a denial of benefits under ERISA. Therefore, Plaintiff's motion will be treated as a motion to overturn the administrator's decision.

need not be decided because, assuming the death was accidental, MetLife's conclusion that it was excluded by the self-inflicted injury provision was not arbitrary and capricious. Therefore, the Court will affirm MetLife's decision to deny benefits and Plaintiff's claim will be dismissed.

**A. Defendants' Motion to Affirm the Administrator's Decision**

The courts are divided on the issue of whether deaths resulting from autoerotic asphyxiation fall within exclusions for self-inflicted injuries. On one hand, several courts have held that a death resulting from autoerotic asphyxiation is not a self-inflicted injury. *See Critchlow v. First Unum Life Ins. Co. of America*, 378 F.3d 246 (2nd Cir. 2004) (reviewing administrator's decision and interpreting plan de novo and concluding that exclusion for self-inflicted injuries did not include death resulting from autoerotic asphyxiation); *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121 (9th Cir. 2002) (same). On the other hand, numerous courts have excluded autoerotic deaths from coverage. *See Cronin v. Zurich American Ins. Co., A.T.*, 189 F.Supp.2d 29 (S.D. N.Y. 2002) (reviewing administrator's decision de novo and finding administrator's conclusion that death resulting from autoerotic asphyxiation was excluded as self-inflicted injury was not arbitrary and capricious); *Hamilton v. AIG Life Ins. Co.*, 182 F.Supp.2d 39 (D. D.C. 2002) (applying arbitrary-and-capricious standard and concluding administrator's decision to deny benefits based on exclusion for self-inflicted injuries was not arbitrary and capricious); *Fugate v. Reliastar Life Ins. Co.*, 2005 WL 1225006 (M.D. Fla. 2005) (same); *Ablow v. Canada Life Assurance Co.*, 2003 WL 23325805 (D. Conn. 2003) (applying de novo review and finding that death resulting from autoerotic asphyxiation is a self-inflicted injury for purposes of ERISA plan); *Bryant v. AIG Life Ins. Co.*, 2002 U.S. Dist. Lexis 23289 (W.D. Mich. 2002) (same); *Fawcett v. Metropolitan Life Ins. Co.*, 2000 WL 979994 (S.D. Ohio 2000). In light of the differing results, the Court is persuaded by those cases concluding

that death resulting from autoerotic asphyxiation is within the scope of the exclusion for self-inflicted injuries.

The court in *Fawcett* was confronted with nearly identical circumstances to the present case. There the plaintiff's husband intentionally engaged in autoerotic asphyxiation, resulting in his death. *See Fawcett*, 2000 WL 979994, *1. The plan administrator denied benefits under the ADD policy reasoning, in part, that the death was excluded under the exclusion for covered losses "in any way result[ing] from, or caused or contributed to by ... injuring oneself on purpose." *Id.* *5. Reviewing the administrator's decision under the arbitrary-and-capricious standard, the court could not say that the administrator's decision was arbitrary and capricious. *See id.* *6. The court provided the following syllogism to explain its reasoning:

1.  Mr. Fawcett's death was caused by the intentional restriction of oxygen to his brain.

2.  To restrict the flow of oxygen to the brain is to inflict injury upon oneself.

3.  Therefore, Mr. Fawcett's death was caused by an intentionally self-inflicted injury.

*Id*. *6. The court further explained that "the weakest link in the foregoing syllogism is the second statement." *Id*. *6.

> The Plaintiff cannot dispute that Mr. Fawcett's death was caused by the intentional restriction of oxygen to his brain. Nor can she dispute that his policy excludes coverage for "intentionally self-inflicted injuries" or "injuring oneself on purpose." Therefore, the critical issue is whether Met Life acted arbitrarily and capriciously when it concluded that the act of restricting the flow of oxygen to the brain is an intentionally self-inflicted injury, within the meaning of its policy exclusion. Upon review, the Court is persuaded that the company did not act arbitrarily and capriciously in reaching such a conclusion.

*Id*. *6. Recognizing the differing views on whether autoerotic asphyxiation constituted an injury, the court noted that "[t]he possibility that reasonable minds may differ on this issue merely confirms

that Met Life did not act arbitrarily and capriciously in making its decision." *Id*. *7. *See Hamilton*, 182 F.Supp.2d at 49 ("[T]he fact that reasonable minds may differ on the question simply proves that it is not an abuse of discretion to decide that partial strangulation is an injury."); *Fugate*, 2005 WL 1225006 ("The fact that reasonable minds may differ on this issue confirms that the Defendant's decision was reasonable.").

The Court agrees with the reasoning in *Fawcett* and finds it highly persuasive in the present case. Assuming all requirements for coverage are met, the ADD policy expressly states: "[w]e will not pay for any Covered Loss shown in Section C if it in any way results from, or is caused or contributed to by ... injuring oneself on purpose." AR at 63. Accordingly, just as in *Fawcett*, the issue is whether the administrator acted arbitrarily and capriciously when it concluded that the act of restricting the flow of oxygen to the brain is an intentionally self-inflicted injury within the meaning of the policy exclusion.

Plaintiff does not dispute that Mr. Bond intentionally placed a rope around his neck, bound his hands and feet, and hung himself from his basement ceiling. Furthermore, Plaintiff does not dispute that Mr. Bond intentionally and knowingly restricted the blood flow from his head in a purposeful effort to limit his brain's supply of oxygen. Plaintiff merely argues that Mr. Bond did not intend to die as a result of this practice. However, whether the death can be classified as accidental is not determinative of whether MetLife was reasonable in concluding that Mr. Bond injured himself on purpose. *See*, *e.g.*, *Fawcett*, 2000 WL 979994, *5-6 (finding the terms "accidental death" and "self-inflicted injury" are not mutually exclusive). The administrative record contains ample evidence from which MetLife could conclude that Mr. Bond's death resulted from a self-inflicted injury. In the opinion section of Mr. Bond's autopsy, the medical examiner concluded that Mr. Bond

9

"died of self-inflicted autoerotic asphyxia." AR at 130. In addition, Plaintiff supplied an affidavit from Dr. Gerald Shiener, a board certified psychiatrist, which stated that while the death was an accident, it was the result of intentionally "limiting the flow of oxygen to the brain" through "the application of pressure to the vessels carrying blood out of the brain" thereby causing "hypercapnia and a concomitant state of hypoxia ...." AR at 204. Moreover, Plaintiff's information regarding the practice of autoerotic asphyxia clearly demonstrates that this activity is done intentionally.[3]

In light of the facts and circumstances surrounding Mr. Bond's death, as well as the facts contained in the administrative record, the Court cannot say that MetLife's decision to deny Plaintiff benefits in this case was arbitrary and capricious. The administrative record clearly shows that Mr. Bond intentionally restricted the flow of oxygen to his brain, which led to the covered loss: the autopsy report, doctors' affidavits, police reports, and medical research all confirm that Mr. Bond's action was done intentionally in a deliberate effort to cut off his brain's supply of oxygen. Moreover, MetLife's reading of the self-inflicted injury provision in this case is not unreasonable in light of the Plan's language, and the fact that reasonable minds may differ on the interpretation of the exclusion only supports the reasonableness of the MetLife's decision. Therefore, as in *Fawcett*, the Court finds that MetLife's conclusion that Mr. Bond's act was a self-inflicted injury, within the meaning of the exclusion, was not arbitrary and capricious.

The cases upon which Plaintiff relies are clearly distinguishable, both procedurally and

---

[3] The research article provided by Plaintiff states that "the typical autoerotic death includes *intentional asphyxiation*." AR at 185 (emphasis added). Furthermore, the article's author found that "autoerotic deaths should be restricted to unnatural, accidental death[s] that [have] resulted directly from the potentially *life-threatening situation that the deceased created*." AR at 192 (emphasis added). Finally, when describing instances of autoerotic deaths, the article states "victim one's death would be classified as a typical autoerotic death because he *intentionally asphyxiated himself*." AR at 194 (emphasis added).

factually, from the present case. *See Critchlow*, 378 F.3d 246; *Padfield*, 290 F.3d 1121; *Lennon v. Metropolitan Life Ins. Co.*, 446 F.Supp.2d 745 (E.D. Mich. 2006); *Harrell v. Metropolitan Life Ins. Co.*, 401 F.Supp.2d 802 (E.D. Mich. 2005). In both *Padfield* and *Critchlow*, which involved deaths during autoerotic asphyxia, the courts reviewed the administrators' decisions de novo and interpreted the language of the plans according to general principles of contract interpretation, which included construing ambiguous language in the policies strictly against the insurer and reading the exclusionary language narrowly. In the present case, the Court does not have the luxury of interpreting the Plan's language de novo, but rather must determine whether MetLife's conclusion was reasonable in light of the Plan's language. Therefore, the courts' reasoning in *Padfield* and *Critchlow* is inapplicable to the present case.[4]

Moreover, *Lennon* and *Harrell* are factually distinct from the present case. Both of these cases involved deaths from driving while intoxicated. In *Harrell*, the court found that it would be unreasonable to read the plan's self-inflicted injury provision to cover hazardous activities generally in light of the plans other exclusions for specific hazardous activities. *See Harrell*, 401 F.Supp.2d at 810. The court concluded that the specific exclusions would be rendered unnecessary if the self-inflicted injury provision was interpreted as a broad exclusion for losses flowing from risky behaviors. *See id.* at 810-11. In *Lennon*, the court found that the defendant acted arbitrarily and capriciously by denying the plaintiff benefits based on the self-inflicted injury provision where the decedent died following a drunk driving accident and the administrative record contained no evidence of the decedent's intent to injure himself. *See Lennon*, 446 F.Supp.2d at 754-55. That is,

---

[4]The dissent in *Padfield* provides an excellent summary of ERISA cases involving autoerotic deaths and points out that the majority inexplicably relied non-ERISA cases in reaching its conclusion. *See Padfield*, 290 F.3d at 1132-34 (Leavy, J., dissenting).

the court found it unreasonable to base a denial of benefits on the self-inflicted injury exclusion without any evidence of intent to inflict an injury upon oneself.

In contrast to *Harrell*, MetLife's reading of the self-inflicted injury provision is not unreasonable in light of the Plan's language. MetLife is not attempting to read the exclusion so as to include all risky behaviors, but rather the risky behavior involved in this case, intentionally restricting the flow of oxygen to one's brain by deliberately placing a rope around one's neck. Unlike *Harrell*, where the administrator's interpretation would render other exclusions superfluous, it is clearly not unreasonable to read the self-inflicted injury exclusion to include Mr. Bond's behavior.

Unlike *Lennon*, where the court's conclusion was based on the lack of evidence that the decedent intended to injure herself, there is ample evidence in the administrative record that Mr. Bond intended to restrict the flow of oxygen to his brain by deliberately placing a rope around his neck. Thus, in contrast to *Lennon*, where it was held arbitrary and capricious for the administrator to base its decision on the self-inflicted injury exclusion without any evidentiary support, MetLife's decision in the present case is well supported by the administrative record and cannot be said to be arbitrary and capricious.

Finally, the Court is not persuaded by Plaintiff's argument that Mr. Bond's death did not result from a self-inflicted injury because autoerotic asphyxia, when practiced successfully, does not result in death. Plaintiff classifies autoerotic asphyxia as merely a hazardous activity and analogizes this case to those in which hazardous activities in general were found to be outside the scope of self-inflicted injury exclusions. *See Lennon*, 446 F.Supp.2d 745; *Harrell*, 401 F.Supp.2d 802. While the Court has no reason to doubt Plaintiff's assertion regarding the successful practice of autoerotic

asphyxia, Mr. Bond's activity in this case constituted more than merely engaging in a risky behavior as the dissent in *Padfield* described:

> [I]n the present case, Mr. Padfield intended to restrict the flow of oxygen to his brain by self-asphyxiation with a necktie. This intentional act inflicted injury from which Mr. Padfield never recovered. Whether such an intentional act leaves ligature marks on the deceased's body is of little or no significance. Mr. Padfield's intentional act of injuring his brain rendered it incapable of functioning. His intentional act caused injury to a live organ. This injury to his brain rendered it incapable of saving him from death. This is an intentionally self-inflicted injury which resulted in death. Such a loss is not covered under the terms of the policy.

*Padfield*, 290 F.3d at 1131. In contrast to other risky behaviors such as sky diving or deep-sea diving, where hypoxia could occur, the goal of those activities, and thus the participant's intent, is not to induce hypoxia. In this case, on the other hand, the risky behavior cannot be separated from the resulting injury. As such, MetLife's decision to deny benefits was entirely reasonable.

**B. Plaintiff's Motion for Summary Judgment**

In light of the foregoing, Plaintiff's Motion for Summary Judgment must be denied. Plaintiff's motion relies entirely on the fact that Mr. Bond's death certificate and autopsy report identify the manner of death as accidental. However, this fact is not a basis for concluding that the death was accidental for the purposes of the Plan's coverage. *See Clark v. Metropolitan Life Ins. Co.*, 369 F.Supp.2d 770 (E.D. Va. 2005) (finding that neither the dictionary definition nor the cause of death as certified by the medical examiner determine whether the death was an accident for purposes of the ERISA-regulated plan); *Ablow v. Canada Life Ins. Co.*, 2003 WL 23335805 (D. Conn. 2003) (finding that in preparing autopsy report a medical examiner is limited to four choices as to manner of death and that this classification is irrelevant to legal analysis of ERISA-based policy); *Klei v. Metropolitan Life Ins. Co.*, 1992 WL 695749 (E.D. Mich. 1992) (same). Moreover, even if the death was accidental, MetLife did not act arbitrarily and capriciously in determining that it fell within the

self-inflicted injury exclusion. Since there was ample evidence in the administrative record for MetLife to determine the death resulted from a self-inflicted injury, the Court cannot say it acted unreasonably. Consequently, the Court cannot overturn the decision to deny ADD benefits.

## V. CONCLUSION

As stated above, the Court's role in this case is limited to reviewing the administrative record to determine whether Defendants acted arbitrarily and capriciously in denying Plaintiff benefits under her husband's ADD policy. After a thorough review of the administrative record and the relevant case law, the Court cannot say that Defendants acted arbitrarily and capriciously in denying Plaintiff benefits. Therefore,

IT IS ORDERED that Defendants' Motion to Affirm the Administrator's Decision is GRANTED and the Administrator's decision is AFFIRMED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment is DENIED and her case is DISMISSED.

IT IS SO ORDERED.

                s/Lawrence P. Zatkoff
                LAWRENCE P. ZATKOFF
                UNITED STATES DISTRICT JUDGE

Dated:  February 21, 2007

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on February 21, 2007.

s/Marie E. Verlinde
Case Manager
(810) 984-3290
